STATE v. ROBERT WHITESIDE, ALIAS WHITLOE, AND PETE CANNON.

(Filed 14 June, 1933.)

1. **Conspiracy B a—**

    A conspiracy is an agreement to do an unlawful thing or to do a lawful thing in an unlawful manner or by unlawful means, and the agreement is the crime and not the execution of the agreement.

2. **Conspiracy B b—Criminal conspiracy may be proven by circumstantial evidence.**

    The criminal offense of conspiracy may be proven by circumstantial evidence, which is usually the only proof obtainable, and the results accomplished, the divergence of these results from the course which would ordinarily be expected, the situation of the parties and their relations to each other, together with the surrounding circumstances and the inferences legitimately deductible therefrom may furnish ample proof of conspiracy even in the teeth of positive testimony to the contrary.

3. **Same—Evidence of conspiracy in this case held sufficient to overrule motion as of nonsuit.**

    In this prosecution for criminal conspiracy there was testimony that the appealing defendant asked the State's witness whether a certain

place was a good place to rob several hours before the place was actually robbed by a codefendant, that the appealing defendant and his codefendant were traveling together, with other testimony tending to establish the appealing defendant's guilt of conspiracy to rob, *is held* sufficient to overrule defendant's motion as of nonsuit.

4. **Criminal Law G r—**

The credibility of a witness whose character has been impeached is a matter for the jury.

5. **Criminal Law L e—**

On appeal in a criminal case the Supreme Court is confined to matters of law or legal inference. Art. IV, sec. 8.

APPEAL by defendant, Pete Cannon, from *Alley, J.,* at February Term, 1933, of BUNCOMBE.

Criminal prosecution tried upon indictment charging the defendants with conspiracy to rob the Imperial Theatre in Asheville.

It is in evidence that the defendants live in McDowell County, and were acquainted with each other, having spent fifteen or twenty days in jail together during the fall of 1932. They "bummed" their way to Asheville on a freight train Friday, 27 January, 1933, and stayed at the Salvation Army that night. The next day, between 3:00 and 4:00 o'clock, they met Ralph McDuffie at the "Pastime Pool Room," and told him they were just traveling around together, going to Knoxville. Cannon asked McDuffie, who apparently was an old acquaintance, if the Imperial Theatre—about half a block away—would be a good place to hold up, or if there were any good places in Asheville which he or anybody might rob and get away with it. McDuffie saw the defendants together again that night about 7:30. At 9:45 when the manager of the Imperial Theatre went to get the money and tickets from the box office, the defendant, Robert Whiteside, stepped up with a gun in his hand and said: "Stick 'em up, and tell the cashier to push out the money." Just as the money was handed to Whiteside, he was covered by a member of the sheriff's office and arrested. He dropped the money on the sidewalk and the manager of the theatre picked it up.

The defendant Whiteside pleaded guilty and was offered as a witness for Cannon. He testified that Ralph McDuffie was mistaken in saying Pete Cannon was with him at the "Pastime Pool Room"; that he alone discussed the matter with McDuffie; and that McDuffie suggested the Imperial Theatre as a good place to rob, and said he would help do it himself. He further testified that Cannon had nothing to do with the hold-up and was not a party to any conspiracy; that he wrote a letter to Cannon while in jail because he knew he was innocent and did not want to see him convicted. He said Cannon was a stranger to him that he had never seen him before he came into the court room. "There was nobody with me at all when I held up the theatre. . . . Some-

body besides Pete Cannon conspired with me to hold it up. . . . I won't tell who he was. . . . I went to the 'Pastime Pool Room' (and talked with McDuffie) but Pete Cannon was not with me."

McDuffie was recalled, after Whiteside had testified, and he reiterated that Cannon was the one who talked with him in the Pastime Pool Room. "I have never had any conversation with Whiteside. I guess he heard the talk I had with Cannon, if he could hear me. He was sitting close by."

McDuffie reported the alleged conversation to the sheriff on Sunday morning following the attempted robbery, in consequence of which Cannon was arrested.

Verdict: "Guilty as charged."

Judgment: Imprisonment in the State's prison at hard labor for a term of not less than seven nor more than ten years.

The defendant, Pete Cannon, appeals, assigning errors.

*Attorney-General Brummitt and Assistant Attorney-General Seawell for the State.*

*Charles A. McCrea and Worth E. McKinney for defendant.*

STACY, C. J., after stating the case: Robert Whiteside, apparently alone and unassisted, attempted to rob the Imperial Theatre in Asheville on Saturday night, 28 January, 1933. Did Pete Cannon aforetime agree to help him? This is the gist of the crime charged against him and of which he stands convicted.

A conspiracy is the unlawful concurrence of two or more persons in a wicked scheme—the combination or agreement to do an unlawful thing or to do a lawful thing in an unlawful way or by unlawful means. *S. v. Lea,* 203 N. C., 13, 164 S. E., 737; *S. v. Ritter,* 197 N. C., 113, 147 S. E., 733. Indeed, the conspiracy is the crime and not its execution. *S. v. Wrenn,* 198 N. C., 260, 151 S. E., 261. Compare *Hyde v. U. S.,* 225 U. S., 347. "As soon as the union of wills for the unlawful purpose is perfected, the offense of conspiracy is completed." *S. v. Knotts,* 168 N. C., 173, 83 S. E., 972.

There is a distinction between the offense to be committed and the conspiracy to commit the offense. *S. v. Brady,* 107 N. C., 822, 12 S. E., 325. In the one, the *corpus delicti* is the act itself; in the other, it is the conspiracy to do the act. Note, 14 Ann. Cas., 156.

Direct proof of the charge is not essential, for such is rarely obtainable. It may be, and generally is, established by a number of indefinite acts, each of which, standing alone, might have little weight, but, taken collectively, they point unerringly to the existence of a conspiracy. *S. v. Wrenn, supra.* When resorted to by adroit and crafty persons, the presence of a common design often becomes exceedingly difficult to

detect. Indeed, the more skillful and cunning the accused, the less plainly defined are the badges which usually denote their real purpose. Under such conditions, the results accomplished, the divergence of those results from the course which would ordinarily be expected, the situation of the parties and their antecedent relations to each other, together with the surrounding circumstances, and the inferences legitimately deducible therefrom, furnish, in the absence of direct proof, and often in the teeth of positive testimony to the contrary, ample ground for concluding that a conspiracy exists. 5 R. C. L., 1088.

So, in the instant case, notwithstanding the positive testimony of Whiteside to the contrary and the rather "broken reed" upon which the State is compelled to rely, we think the evidence is sufficient to carry the case to the jury. Its credibility was for the twelve.

The keystone of the State's evidence is the alleged conversation had between Ralph McDuffie and the defendant Cannon at the "Pastime Pool Room," some five or six hours before the attempted robbery. It is suggested that McDuffie's interest in the case arises out of a guilty conscience, and a desire to shield himself, rather than from any urge to see the law enforced. He was asked on cross-examination if he had not had a fight with Cannon over a girl in Charlotte sometime prior thereto. His reply was, that he had not. The general reputation and character of the State's witness, like that of the defendant's, seems to have been somewhat shady or spotted. He is well known to the "law," to use his vernacular, which means he is well known to the officers of the law, who regard him as a suspicious character. His testimony is not very impressive, but its credibility was for the jury.

If the defendant has been erroneously convicted, as he contends, he must attribute it to his evil associations. His appeal was to the jury, and we are not able to help him. Our jurisdiction is limited to reviewing, upon appeal, decisions upon any matter of law or legal inference. Const., Art. IV, sec. 8.

No error.